## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **GEORGE CANSLER, on his own behalf, and on behalf of a class of those similarly situated,**<br><br>*Plaintiff,*<br><br> v.<br><br>**UNIVERSITY HEALTH SYSTEMS OF EASTERN CAROLINA, INC., EAST CAROLINA HEALTH-CHOWAN, INC., HALIFAX REGIONAL MEDICAL CENTER, INC., ROANOKE VALLEY HEALTH SERVICES, INC., PITT COUNTY MEMORIAL HOSPITAL, INC., DUPLIN GENERAL HOSPITAL, INC., EAST CAROLINA HEALTH-BEAUFORT, INC., EAST CAROLINA HEALTH-BERTIE, INC., EAST CAROLINA HEALTH-HERITAGE, INC., THE OUTER BANKS HOSPITAL, INC., VIDANT MEDICAL GROUP AFFILIATES, LLC, VIDANT MEDICAL GROUP, LLC, VIDANT INTEGRATED CARE, LLC, and FIRSTPOINT COLLECTION RESOURCES, INC.,**<br><br>*Defendants.* | **CLASS ACTION COMPLAINT** |

i

**TABLE OF CONTENTS**

I.  NATURE OF THE ACTION ...................................................................................... 1

II. THE PARTIES............................................................................................................. 2

A.  Plaintiff................................................................................................................. 2

B.  Defendants............................................................................................................. 2

III. JURISDICTION AND VENUE ............................................................................... 5

IV.  FACTUAL BACKGROUND .................................................................................... 6

A.  How Prices of Medical Services Are Set for Patients with Commercial Insurance......... 6

B.  Background on Vidant, its Unreasonable Prices, and its Refusal to Disclose Prices....... 9

C.  Background on Defendants' Unlawful Means of Attempting to Collect Debts. ............ 12

D.  Facts Regarding Plaintiff and his Experience with Defendants' Unlawful Conduct. .... 13

E.  Mr. Cansler Receives Care from Vidant Chowan Hospital. ............................................. 13

F.  Mr. Cansler receives bills with unreasonable prices to which he did not assent............ 15

V.  CLASS ALLEGATIONS. .......................................................................................... 20

VI. CLAIMS FOR RELIEF............................................................................................ 22

Count One (UDTPA) ...................................................................................................... 22

Count Two (Declaratory Relief) ................................................................................... 24

Count Three (FDCPA) .................................................................................................... 26

Count Four (NCCAA) ..................................................................................................... 27

JURY DEMAND ............................................................................................................... 28

PRAYER FOR RELIEF.................................................................................................... 28

Plaintiff, George Cansler, through counsel, acting on his own behalf and on behalf of a putative class of those similarly situated, brings this action for violations of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C.G.S. § 75-1 *et seq*., the Declaratory Judgment Act, 28 U.S.C. § 2201(a) *et seq.*, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*., and the North Carolina Collection Agency Act ("NCCAA"), N.C.G.S. § 58-70 *et seq*., against Defendants University Health Systems of Eastern Carolina, Inc., East Carolina Health-Chowan, Inc., Halifax Regional Medical Center, Inc., Roanoke Valley Health Services, Inc., Pitt County Memorial Hospital, Inc. Duplin General Hospital, Inc., East Carolina Health-Beaufort, Inc., East Carolina Health-Bertie, Inc., East Carolina Health-Heritage, Inc., The Outer Banks Hospital, Inc., Vidant Medical Group Affiliates, LLC, Vidant Medical Group, LLC, Vidant Integrated Care, LLC (collectively, "Vidant"), and FirstPoint Collection Resources, Inc. ("FirstPoint"), and states as follows based on personal knowledge, investigation of counsel, and information and belief:

## I.  NATURE OF THE ACTION

1.      This action concerns unfair and deceptive billing and collection practices engaged in by Vidant and FirstPoint.  Defendants grossly overcharged Mr. Cansler without having any enforceable agreement with him to pay Vidant's inflated prices.  Defendants then utilized aggressive, manipulative, and illegal collection practices in an attempt to coerce him to pay an unreasonable amount to which he had never agreed.  Indeed, Vidant had a policy of not disclosing to patients like Mr. Cansler the prices of Vidant's services.  This was despite the fact that Vidant was aware that many patients, like Mr. Cansler, would have to bear the vast majority of that expense after the services were provided.  Mr. Cansler's experience is typical of insured patients

1

who receive care at Vidant facilities.  He therefore sues for damages and declaratory relief both for himself and a class of those similarly situated.

## II.  THE PARTIES

### A.  Plaintiff.

2.     Plaintiff George Cansler is a resident of Edenton, North Carolina, Chowan County.

### B.  Defendants.

3.     Defendant University Health Systems of Eastern Carolina, Inc. d/b/a Vidant Health, is a North Carolina nonprofit corporation. Its principal place of business is located at 800 W.H. Smith Boulevard, Greenville, NC 27834, Pitt County.  It may be served with process through its registered agent at P.O. Box 6028, Greenville, NC 27835.

4.     Vidant Health is a not-for-profit, 1,447-bed hospital system that serves more than 1.4 million people in 29 counties in Eastern North Carolina.  The system is made up of nine hospitals and more than 12,000 employees.  Its estimated revenue for the year 2017 was $1,693,152,000.  It is one of the largest health systems in the State.  It is sophisticated as an organization and has far greater resources than an individual consumer.  "Vidant Health" appears on the bills Mr. Cansler received.  On information and belief, in the past Vidant Health has made collection claims in consumer bankruptcies regarding medical bills.  On information and belief, Vidant Health primarily controlled and directed the billing practices alleged herein.

5.     Defendant East Carolina Health-Chowan, Inc., d/b/a Vidant Chowan Hospital, is a North Carolina nonprofit corporation. Its principal place of business is located at 800 W.H. Smith Boulevard, Greenville, NC 27834. It may be served with process through its registered agent Michael Waldrum at P.O. Box 6028, Greenville, NC 27835.  As described below, the Plaintiff's relevant service occurred at Vidant Chowan Hospital.

6.     Defendant Halifax Regional Medical Center, Inc., operating under the name Vidant North Hospital, is a North Carolina nonprofit corporation. Its principal place of business is located at 800 W.H. Smith Boulevard, Greenville, NC 27834. It may be served with process through its registered agent Michael Waldrum at P.O. Box 6028, Greenville, NC 27835.

7.     Defendant Roanoke Valley Health Services, Inc., operating under the name Vidant North Hospital, is a North Carolina nonprofit corporation. Its principal place of business is located at 2100 Stantonsburg Road, Greenville, NC 27834. It may be served with process through its registered agent Michael Waldrum at 800 W.H. Smith Boulevard, Greenville, NC 27834.

8.     Defendant Pitt County Memorial Hospital, Inc., operating under the name Vidant Medical Center, is a North Carolina nonprofit corporation. Its principal place of business is located at 800 W.H. Smith Boulevard, Greenville, NC 27834. It may be served with process through its registered agent Michael Waldrum at P.O. Box 6028, Greenville, NC 27835.

9.     Defendant Duplin General Hospital, Inc., operating under the name Vidant Duplin Hospital, is a North Carolina nonprofit corporation. Its principal place of business is located at 800 W.H. Smith Boulevard, Greenville, NC 27834. It may be served with process through its registered agent Michael Waldrum at P.O. Box 6028, Greenville, NC 27835.

10.     Defendant East Carolina Health-Beaufort, Inc., operating under the name Vidant Beaufort Hospital, is a North Carolina nonprofit corporation. Its principal place of business is located at 800 W.H. Smith Boulevard, Greenville, NC 27834. It may be served with process through its registered agent Michael Waldrum at P.O. Box 6028, Greenville, NC 27835.

11.     Defendant East Carolina Health-Bertie, Inc., operating under the name Vidant Bertie Hospital, is a North Carolina nonprofit corporation. Its principal place of business is located

at 800 W.H. Smith Boulevard, Greenville, NC 27834. It may be served with process through its registered agent Michael Waldrum at P.O. Box 6028, Greenville, NC 27835.

12. Defendant East Carolina Health-Heritage, Inc., operating under the name Vidant Edgecombe Hospital, is a North Carolina nonprofit corporation. Its principal place of business is located at 800 W.H. Smith Boulevard, Greenville, NC 27834. It may be served with process through its registered agent Michael Waldrum at P.O. Box 6028, Greenville, NC 27835.

13. Defendant The Outer Banks Hospital, Inc., is a North Carolina nonprofit corporation. Its principal place of business is located at 4800 South Croatan Highway, Nags Head, NC 27959. It may be served with process through its registered agent Michael Waldrum at P.O. Box 6028, Greenville, NC 27835.

14. Defendant Vidant Medical Group Affiliates, LLC, is a North Carolina limited liability company. Its sole member is Vidant Medical Group, LLC, a North Carolina limited liability company. Vidant Medical Group Affiliates, LLC's principal office is located at 800 W.H. Smith Boulevard, Greenville, NC 27834. It may be served with process through its registered agent, Michael R. Waldrum, at P.O. Box 6028, Greenville, NC 27835.

15. Defendant Vidant Medical Group, LLC, is a North Carolina limited liability company. Its sole member is Defendant University Health Systems of Eastern Carolina, Inc. Its principal office is located at 2100 Stantonsburg Road, Greenville, NC 27834. It may be served with process through its registered agent, Michael R. Waldrum, at P.O. Box 6028, Greenville, NC 27835.  On information and belief, in the past Vidant Medical Group, LLC has made collection claims in consumer bankruptcies regarding medical bills.

16. Defendant Vidant Integrated Care, LLC, is a North Carolina limited liability company. Its sole member is Defendant University Health Systems of Eastern Carolina, Inc. Its

4

principal office is located at 800 W.H. Smith Boulevard, Greenville, NC 27834. It may be served with process through its registered agent, Michael R. Waldrum, at P.O. Box 6028, Greenville, NC 27835.

17.     On information and belief, during the pertinent times, Vidant Medical Group Affiliates, LLC, Vidant Medical Group, LLC and Vidant Integrated Care, LLC participated with Vidant Health and the Vidant hospitals in effectuating the billing practices alleged herein and are each jointly and severally liable due to their direct active involvement in the subject practices.

18.     Defendant FirstPoint is a North Carolina corporation.  Its principal place of business is located at 225 Commerce Pl., Greensboro, NC 27401. It may be served with process through its registered agent Anthony Robertson at 225 Commerce Pl., Greensboro, NC 27401.  It holds a collection agency license under N.C.G.S. § 58-70-1 and is a "debt collector" under the FDCPA, 15 U.S.C. §1692a(6) and a "collection agency" under N.C.G.S. §§ 58-70-15 and 58-70-90(1).

### III.  JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over Plaintiff's federal claim under the FDCPA pursuant to 28 U.S.C. § 1331, because the claim arises under federal law.  The Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367, because they arise out of the same transactions or occurrences.

20.     In addition, the Class Action Fairness Act, or CAFA, 28 U.S.C. § 1332(d), establishes subject matter jurisdiction, in that the putative class meets CAFA jurisdictional requirements of minimal diversity, because some class members live in Virginia; there are 100 or more putative class members, and more than $5 million in controversy.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because Vidant transacts business in, is found in, or has agents in this judicial district, and because some of the actions giving rise to this complaint took place within this district.

22.     The Court has personal jurisdiction over the Defendants.

## IV.  FACTUAL BACKGROUND

23.     Vidant and FirstPoint have operated a system that saddles patients with astonishingly high medical bills.  Vidant knows that the prices it charges patients for medical services are unreasonably high.  Indeed, when patients ask Vidant representatives about the cost of care before they receive a service, Vidant has had a policy of refusing to tell patients the price it plans to charge.  Thus, Vidant made it impossible for patients to make an informed financial decision about their care, and patients could not—and did not—willingly consent to pay Vidant's unreasonable, undisclosed prices.

24.     After patients received care, Vidant compounded the financial harm patients suffered by harassing them to pay these excessive fees, including by sending their bills to FirstPoint and implicitly threatening their credit score.

25.     In this way, and as described more fully below, Defendants have used and continue to use an unfair, deceptive scheme designed to extract undisclosed and unreasonably high prices from patients.

## A.  How Prices of Medical Services Are Set for Patients with Commercial Insurance.

26.     With respect to patients with commercial insurance (as opposed to government insurance such as Medicare or Medicaid), the market for hospital services is different to other markets because the person consuming the hospital services, the patient, does not negotiate—and

in many cases, such as here, cannot even know beforehand—the costs of the medical services they are consuming.

27.     Instead, commercial health plans, such as Blue Cross Blue Shield of North Carolina ("Blue Cross"), purchase medical services for the benefit of their insured members, the consumers. Commercial health plans negotiate with hospitals for the price the plans will pay for medical services, known as the "allowed amount," before services are consumed by members.

28.     Commercial health plans do not negotiate with hospitals on a service-by-service basis; rather, they negotiate with hospitals for bundles of services that the health plan will offer to members as "in-network" benefits.  If the health plan and hospital reach a deal for a bundle of services (for instance, all acute inpatient hospital services), the hospital will be considered in-network for every service in that bundle.  This means that for any service in that bundle, if a commercial health plan's member receives that service from the hospital, the health plan will pay the hospital some share of the allowed amount those two parties negotiated for that service.

29.     Under most commercial health plans, the patient will then be responsible for paying the share of the allowed amount that the insurance company did not pay.  For insured patients with so-called "high deductible" plans, such as Mr. Cansler, the patient bears responsibility for paying the vast majority of the allowed amount for a particular procedure (*e.g.*, 80%), until the deductible is met.  Thus, for the first several thousand dollars of medical treatment a patient receives each year, the patient pays a significant majority of that cost.

30.     Because of the ever-rising costs of health care, many group and individual private insurance plans have high deductibles or other mechanisms that place a significant payment obligation on the consumer.

7

31.     Healthcare consumers are in a unique posture to be exploited by a revenue-minded hospital system because they generally do not know nor consent to the costs prior to the service. Rather, they reasonably assume that the hospital system will have the integrity to use reasonable prices.

32.     Consumers are unaware that their treating doctors, as well, generally have no knowledge of the prices being charged by the hospitals for their services nor do they have any control over what those prices should be. Rather, such functions are carried out by an entirely separate billing and administrative component of the system.

33.     Each hospital keeps its own "chargemaster," a list of all of the hospital's billable items and the corresponding charges. These charges are set by the hospital and are not the reasonable amounts consumers would expect to be charged.

34.     Patients are in general not privy to the allowed amounts their insurer has negotiated with hospitals for various services. These bundled prices are a function of the artificial chargemaster prices and are not disclosed to patients. At no point do patients agree to specific prices for specific procedures. Thus, despite the fact that the patient is the one consuming the services and will often bear a significant amount of the financial responsibility for the services they consume, a patient like Mr. Cansler does not know before they consume a service how much it will cost them. Compounding matters, at all times relevant to this litigation, Vidant followed a corporate a policy of not disclosing the allowed amount of its services to patients even if they asked.

35.     In the absence of an agreement between the patient and the hospital as to a particular service's price, the hospital is not entitled to the full chargemaster for that service, because the chargemaster is much higher than the reasonable cost of the service.

36.     One measure of the reasonable price for a service is the rate that Medicare pays, because Medicare ties the prices it pays for a given service to the cost of providing that service plus a small profit margin.  For most services, the chargemaster price for a service is many times higher than what a hospital would receive for that service from Medicare.

37.     For example, the 2018 Medicare rate for the CT scan that Mr. Cansler received (discussed in more detail below) was $302.60.  However, Vidant's chargemaster for that same service was $4,000, more than 13 times higher.  And the allowed amount for that CT scan under Mr. Cansler's plan was $3,576, more than 11 times the Medicare rate.

38.     This huge disparity between the Medicare rate and the price Vidant charges individuals like Mr. Cansler is not limited to CT scans.  For many other common procedures, Vidant charges patients more than 10 times the rate that Medicare would pay for that identical service.

39.     Vidant patients never assent to health care providers' chargemasters, nor would they if they had a meaningful choice.

40.     Neither Vidant's chargemasters nor the allowed amounts they negotiate with commercial health plans are reasonable rates for the relevant services.

41.     Under North Carolina law, where there is no contract specifying the rate to be charged for treatment, a hospital is entitled only to the reasonable value of the service it provides.

**B.  Background on Vidant, its Unreasonable Prices, and its Refusal to Disclose Prices.**

42.     University Health Systems of Eastern Carolina, Inc. was created in 1997.  In 2011, it changed its "doing business as" name to Vidant Health.

9

43. Vidant Health controls and operates nine hospitals in Eastern North Carolina. Each hospital is its own corporation, with Vidant Health's CEO, Waldrum, acting as the registered agent for all of them.

44. The Vidant system is centrally controlled and Vidant Health issues corporate policies addressing financial management that each of the hospital corporations is expected to follow.

45. Each of the Vidant hospitals keeps its own chargemaster. Each of the Vidant hospitals' chargemaster and allowed amount rates for CT scans grossly exceed any reasonable value of the service. Vidant hospitals charge similarly inflated chargemasters and allowed amounts for many other common procedures and services.

46. Medicare reimbursement prices are often used as benchmarks, representing a fair amount for the procedure.

47. The Medicare reimbursement price for a CT scan, abdominal and pelvis, CPT code 74176, in North Carolina in 2018 was $302.60 and in 2021 was $315.

48. During the pertinent times, Vidant hospitals charged patients well in excess of that price for the same CT scan procedure. The 2021 chargemaster prices were:

- Vidant Chowan Hospital: $4,000,
- Vidant Medical Center: $4,996,
- Vidant Edgecombe Hospital: $4,720,
- The Outer Banks Hospital: $4,200,
- Vidant Duplin Hospital: $3,785,
- Vidant North Hospital: $2,713.20,
- Vidant Beaufort Hospital: $2,533,
- Vidant Bertie Hospital: $1,785, and
- Vidant Roanoke Hospital: $1,727.

49. Vidant's business practices have sought to harass patients into paying their excessive prices. During the pertinent times, Vidant set unreasonable prices, deliberately did not

disclose its prices to patients like Mr. Cansler prior to treatment, sought to bill the patients for the excessive prices after the fact and, when patients were unable or unwilling to pay the inflated prices, sought to coerce them into payment by threatening their credit score and engaging in collection efforts.

50. As of 2018, Vidant refused to disclose its costs to patients prior to treatment, even if they asked. Vidant claimed that the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, prohibited it from informing patients of the costs of care, and, while knowing that patients would not be disclosed the costs until after the care, set egregiously high costs for the care.

51. EMTALA has never prohibited hospitals from disclosing chargemasters or allowed amounts to patients. EMTALA requires that hospital emergency departments provide a medical screening examination to any person who comes to the emergency department and requests an examination. EMTALA prevents the hospital from refusing to examine or treat a patient based on their insurance status, ability to pay, national origin, race, creed, or color.

52. Vidant now provides a cost estimator on its website, which demonstrates that Vidant does not believe cost disclosure prior to treatment is a violation of EMTALA. On information and belief, the cost estimator was not available prior to 2021.

53. On information and belief, Vidant created the cost estimator to comply with 45 C.F.R. § 180.40, which required hospitals to disclose such prices as of January 1, 2021. There has been no substantive change to EMTALA that would alter what Vidant is or is not permitted to disclose with respect to the prices of services.

54. In justifying its policy of refusing to disclose prices in advance, Vidant by letter dated December 12, 2019 to Mr. Cansler claimed that "[i]n addition to being a violation of federal

law," "[t]he discussion of healthcare pricing or costs with patients can deter patients and their families from seeking assistance that they may desperately need." Since 2019, there has been no substantive change to patient motivations that would alter what Vidant can disclose to patients about the prices of its services. And yet, Vidant now makes this some of information available on its website, belying its EMTALA contentions that somehow that statute ties its hands.

**C. Background on Defendants' Unlawful Means of Attempting to Collect Debts.**

55.    Vidant coerces patients into paying their excessive prices by threatening to send them to collections, report them to credit reporting agencies, damaging their credit scores, and imposition of interest and legal fees on top of a billed amount that is unreasonable and based on a contract that is unenforceable for lack of a price term or contains an open price term.

56.    Vidant sends repeated bills to patients stating short payment deadlines.

57.    If a patient does not pay Vidant's exorbitant rates on their timeline, they are sent "Final Notices" threatening to refer the account to collections and/or credit reporting agencies with even shorter ten-day deadlines.

58.    The "Final Notices" can arrive after the supposed deadline due to mail delays for Vidant Health's primarily rural customer base.

59.    Vidant Health then refers the bills to its debt collector, FirstPoint, which threatens to send the debt for listing on the patient's credit report. In its initial collection letter, FirstPoint recites that it may report the debt to credit reporting agencies.

60.    FirstPoint is regularly engaged in the collection of debts from consumers using the means and instrumentalities of interstate commerce, including but not limited to, the United States mail and interstate telephone communications.

12

61.     While not a licensed debt collector itself, Vidant through its billing office aided and abetted FirstPoint in its debt collection activities and the Vidant and FirstPoint entities engaged in concerted action, for example when Vidant would "recall" the debt from FirstPoint only to later send another "Final Notice" then transmit the file back to FirstPoint.

**D.  Facts Regarding Plaintiff and his Experience with Defendants' Unlawful Conduct.**

62.     Mr. Cansler has a Master's Degree in Accounting, and works in managerial capacity at a private company.  As an accountant, he is used to strict ethical and legal compliance in economic transactions.

63.     At all times relevant to this lawsuit, Mr. Cansler paid for private group health insurance from Blue Cross.

64.     At all times relevant to this lawsuit, Mr. Cansler had a "Blue Options" plan.

65.     Under the Blue Options plan, Vidant Chowan Hospital was an "in-network hospital," meaning that Blue Cross and Vidant had negotiated allowed amounts for most procedures Blue Cross's insured patients were likely to receive.

66.     Blue Cross negotiates rates that it pays Vidant Chowan Hospital that are lower than Vidant's chargemaster.  However, for many plans including Mr. Cansler's Blue Options plan, the allowed amounts remain unreasonably high, for many services in excess of 10 times the Medicare rate for those procedures.

**E.  Mr. Cansler Receives Care from Vidant Chowan Hospital.**

67.     On or about June 6, 2018, Mr. Cansler visited the Vidant Chowan Hospital emergency room due to pain secondary to what he felt was a likely kidney stone (he subsequently passed the stone).  Mr. Cansler had experienced kidney stones before, so he was highly confident that the pain he felt was due to a kidney stone.

68.     Mr. Cansler has excellent credit and is not accustomed to having himself or his family on the receiving end of collection efforts.

69.     Mr. Cansler went to Vidant Chowan Hospital's emergency room because there were no urgent care facilities proximate to his home, and Vidant Chowan Hospital did not have another mechanism for admitting patients with non-emergency but still time-sensitive medical issues, such as having a kidney stone.  Mr. Cansler understood that his condition was not an emergency, and he would not have visited the emergency room if he had any other option for receiving medical care.

70.     Upon arriving at Vidant Chowan Hospital, Mr. Cansler paid $100.

71.     During his visit, he received, among other services for which there were charges, a CT scan.

72.     Mr. Cansler's medical records reflect the existence of a form titled "Authorization & Consent for Treatment and Assignment of Benefits" signed by him on June 6, 2018, containing these representations among others:

a.      "I hereby agree to pay all charges of Facility that are not covered or paid within a reasonable time by any medical insurance/coverage, whether or not I am otherwise legally obligated to pay."

b.      "I understand that I am financially responsible to the Hospital and physicians for charges not paid by insurance.  If an unpaid balance is sent to a collection agency, I will be responsible for any legal fees and/or interest associated with collection of debt."

73.     The term "charges" is not defined and the form does not contain any other price term.  Under those circumstances, patients have not agreed to pay the inflated chargemaster or allowed amounts.  Patients owe only the reasonable cost for that service.

74.     Had Mr. Cansler known that Vidant would seek to hold him personally financially responsible for thousands of dollars for a CT scan, he would have elected not to receive the service at Vidant on June 6, 2018.  This would have been a medically appropriate decision.

**F.    Mr. Cansler receives bills with unreasonable prices to which he did not assent.**

75.     On or about June 19, 2018, Blue Cross sent Mr. Cansler an Explanation of Benefits ("EOB") statement.  The EOB listed a total billed amount of $6,251.70.

76.     According to the EOB, Mr. Cansler received member savings of $662.68.  Blue Cross paid $1,326.11.  The EOB noted that the amount the provider may bill Mr. Cansler was the remaining $4,262.91, consisting of co-insurance of $884.08 and $3,378.83 within Mr. Cansler's deductible.  The provider billed $4,000 for unspecified services.

77.     Mr. Cansler was shocked and surprised to receive a bill for over $3,000 for a short visit to an in-network hospital.

78.     Mr. Cansler did not receive an itemized bill until September 2019, more than a year later and after he raised concerns.  That itemized bill detailed that the $4,000 charge was for "HB-CT ABDOMEN AND PELVIS W/O CONTRAST."  The bill listed the allowed amount for this procedure as $3,576 with Blue Cross paying $456.61 of that amount.  This left $3,119.39 which Vidant Health claimed Mr. Cansler was required to pay for that CT scan.

79.     Before receiving that itemized bill in September 2019, Vidant sent Mr. Cansler several other bills claiming that he owed thousands of dollars.

80.     On or about June 22, 2018, Vidant Health sent Mr. Cansler an initial bill for $4,162.91, noting that Mr. Cansler had paid $100 toward the total.  The bill stated that payment was due July 12, 2018.

81.     On or about July 22, 2018, Vidant Health sent Mr. Cansler a second bill for $4,162.91. The bill stated that payment was due August 11, 2018.

82.     On or about August 22, 2018, Vidant Health sent Mr. Cansler a third bill for $4,162.91. The bill stated that payment was due September 11, 2018.

83.     Mr. Cansler made three $50 payments to keep his account in good standing between August and October 2018. While he disputed the amount owed, and the price for a CT scan struck him as outrageous, he was not a medical billing expert and was looking into the issue.

84.     On or about September 27, 2018, Mr. Cansler wrote a letter to Vidant Health's central billing office disputing the charges and requesting further information.

85.     Vidant Health placed Mr. Cansler's bill under review, claiming that they would reach out to him when the review was completed.

86.     On or about July 26, 2019, more than a year after he received care, Vidant Health adjusted Mr. Cansler's bill down by $184. While this bill was sent at some point to Mr. Cansler's insurer, Blue Cross, Mr. Cansler only learned about the reduction and the reasoning behind it when he reached out to the President of Vidant Chowan Hospital, Brian Harvill.

87.     As a result of the reduction in Mr. Cansler's amount owed, Blue Cross adjusted the amount it paid down as well. Blue Cross sent Mr. Cansler a revised EOB on or about December 4, 2018, adjusting the amount it covered from $1,326.11 to $1,227.42. The EOB showed that Vidant billed $4000 for what we now know was the CT scan; the allowed amount for the CT scan was $3,576.00; and "BCBSNC Paid" "$456.61."

88.     On or about July 29, 2019, Vidant Health sent Mr. Cansler a "Final Notice." Vidant Health did so without contacting Mr. Cansler to communicate that the review was complete. Vidant Health now claimed Mr. Cansler owed $3,871.70.

89.     The Final Notice stated that "This is your FINAL NOTICE. Your account may be referred to an outside collection/credit reporting agency if full payment or satisfactory arrangements are not made within 10 days of the date of this letter."

90.     Mr. Cansler did not receive the Final Notice until on or about August 14, 2019, already outside the ten-day window listed in the letter.

91.     Eight of the nine Vidant hospitals service rural areas and Vidant Health is or should be aware that mail deliveries are slower in rural areas, potentially taking more than the ten-day window.

92.     For Mr. Cansler, who had bill processing and bookkeeping responsibilities as part of his own career, it was shocking and surprising to be receiving a "FINAL NOTICE" from a large and well-known hospital system for an inflated, unreasonable charge he had never agreed to.

93.     During an extensive back and forth with Mr. Cansler, Vidant Chowan President Harvill blamed Mr. Cansler's high deductible plan for "pushing a lot of this invoice to you personally." Harvill told Mr. Cansler that 80% of patients at Vidant Chowan are non-paying patients and, as a result, the other 20% must pay the hospital to cover the 80% who cannot pay. Vidant has publicly referred to this additional cost as a "hidden tax" that non-Medicaid or Medicare patients must pay without the knowledge that they are overpaying for services.

94.     Vidant eventually offered to apply a downward administrative adjustment of $873 to Mr. Cansler's bill, which Harvill described as a "cash payer discount." This adjustment occurred only after Mr. Cansler pointed out multiple billing discrepancies and the wide variation in chargemaster prices across Vidant Health hospitals, with Vidant Chowan Hospital charging $4,000 for the same procedure for which Vidant Roanoke Hospital charges $1,727. Even the significantly lower Vidant Roanoke charge was more than five times the Medicare price for the same service.

95. Following the administrative adjustment, Vidant Health claimed that Mr. Cansler still owed $2,998.70.

96. On August 15, 2019, Plaintiff visited the business office at Vidant where Jennifer (Business Office Manager) informed him that the review done by staff at the hospital had concluded the charges were correct. She said they had recently installed a new billing system and the Final Notice notification was sent in error as the bill had only recently come out of review. She said the account should not have gone to "threat of collection" status that quickly and apologized for the error. She then asked if he wanted to set up a payment plan. Mr. Cansler shared with Jennifer the Healthcare Blue Book (www.healthcarebluebook.com) documentation of a fair price for a CT scan. Jennifer responded to the effect that Vidant Health was a private hospital and, essentially, that they could charge any price they wanted to for services.

97. Mr. Cansler attempted to continue to negotiate with Vidant Health but was repeatedly rebuffed. Vidant Health's Risk Management Senior Administrator, Jamie Grady, claimed in a letter dated December 12, 2019, that EMTALA prevented Vidant from providing any cost information to patients prior to treatment.

98. On or about December 21, 2019, Mr. Cansler wrote a letter to Ms. Grady asking for an explanation of her claim that EMTALA prevented Vidant Health from providing patients with cost information prior to treatment.

99. On or about January 3, 2020, Vidant Health sent Mr. Cansler another Final Notice stating that "This is your FINAL NOTICE. Your account may be referred to an outside collection/credit reporting agency if full payment or satisfactory arrangements are not made within 10 days of the date of this letter."

100.    On or about January 23, 2020, Ms. Grady repeated her claim that EMTALA prevented Vidant Health from providing cost information to its patients prior to treatment.  She stated that Mr. Cansler's account would be put on hold for 30 days so he could arrange payment.

101.    Mr. Cansler responded to Ms. Grady's letter on or about February 15, 2020, challenging the justifications offered in her letter.

102.    On or about October 7, 2020, Mr. Cansler wrote another letter to Ms. Grady because he had not received any response.

103.    On or about October 13, 2020, Mr. Cansler received a call from FirstPoint attempting to collect on the $2,998.70 debt Vidant Health had referred to it.

104.    On or about October 17, 2020, Mr. Cansler received a letter from FirstPoint advising him that his debt had been turned over to them for collection.

105.    For Mr. Cansler, who had good credit, and who with his accounting background prided himself on being financially prudent, receiving this debt collection notice from FirstPoint was surprising and shocking.

106.    On or about October 17, 2020, Mr. Cansler responded to the letter from FirstPoint, advising that the debt was disputed.  He asked that any future communications be in writing and that FirstPoint not call again.

107.    On or about November 11, 2020, FirstPoint responded to Mr. Cansler's October 17, 2020 letter by stating that they had verified the debt with Vidant.

108.    On or about November 18, 2020, Ms. Grady responded to Mr. Cansler's February 15 and October 7, 2020 letters stating that while Vidant Health was "under no obligation to pull [his] account from collection," she would be recalling the account from FirstPoint for 30 days "as a public relations gesture."

19

109.     On or about December 16, 2020, FirstPoint sent Mr. Cansler a letter informing him that Vidant Health had recalled his account from collections.

110.     On or about January 15, 2021, Vidant Health sent Mr. Cansler a bill for $2,998.70. The bill stated that payment was due on February 4, 2021.

111.     On or about February 19, 2021, Mr. Cansler received a voicemail from FirstPoint on his work phone attempting to collect on the debt.

112.     On or about February 20, 2021, Mr. Cansler again wrote FirstPoint a letter disputing the debt.

113.     On or about May 26, 2021, against Mr. Cansler's written instructions, Mr. Cansler's wife received a call from FirstPoint attempting to collect the debt.

114.     Unfortunately for residents of Eastern North Carolina, Mr. Cansler's experience is typical of patients who receive care from Vidant.   Moreover, because Vidant is a regional monopolist, residents of Eastern North Carolina have no choice but to submit to its unreasonable charges and aggressive collection efforts.

## V.  CLASS ALLEGATIONS

115.     Plaintiff seeks to represent a class defined as follows:

   a.   Vidant class:  All individuals who: visited a Vidant facility emergency room within the last four years; signed (personally or through an authorized agent) the "Authorization & Consent for Treatment and Assignment of Benefits" or a similar form; received a CT scan or other services; and they or their guarantor was thereafter billed personally for Vidant's chargemaster or negotiated rates.

   b.   FirstPoint subclass:  All members of the Vidant class who were subjected to debt collection efforts within the last year, including receiving one or more collection letters from FirstPoint regarding their Vidant bill.

116.     Under Rule 23(a)(1), the class is so numerous that joinder of all members is impracticable.  Vidant facilities have provided individuals within the class definition thousands of

services within the last four years. There is no indication Mr. Cansler's billing experience was

unusual.

117. Under Rule 23(a)(2), questions of law or fact common to the class include:

    a. Did Defendant engage in unfair and deceptive billing and collection practices?

    b. Does the "Authorization & Consent for Treatment and Assignment of Benefits" form fail as a contract for lack of a price term, such that there is no enforceable contract among the parties, and under quantum meruit, only a reasonable price is deemed?

    c. Alternatively, does the "Authorization & Consent for Treatment and Assignment of Benefits" form contain an open price term, such that under contract law a reasonable price is deemed?

    d. Did Vidant bill more than the reasonable value of the services for CT scans that individuals received?

    e. Did Vidant bill more than the reasonable value of the services for other services that individuals received?

    f. Are patients who paid more than the reasonable value of services entitled to disgorgement of amounts they have paid to Defendants over and above the reasonable value of the services?

    g. Are patients who paid more than the reasonable value of services entitled to declaratory judgment that they do not owe anything further on the debt and should not be subject to further debt collection efforts?

    h. Did FirstPoint engage in unlawful debt collection efforts with regard to the class members?

    i. Are class members entitled to damages against FirstPoint?

118. Under Rule 23(a)(3) the claims of the representative parties are typical of the claims

of the class. Mr. Cansler received a CT scan and/or other services from a Vidant provider; signed

a form which was not an enforceable written contract; was billed far above the reasonable value

of the service; and by law was only obligated to pay a reasonable amount. Moreover, on

information and belief, his experience related to Vidant's and FirstPoint's collection efforts are typical to those of the putative class.

119.    Under Rule 23(a)(4), the representative party will fairly and adequately protect the interests of the class.

120.    Under Rule 23(b)(1), a class action may be maintained because Rule 23(a) is satisfied and prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

121.    Further, under Rule 23(b)(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

122.    Further, under Rule 23(b)(3), the questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

123.    In the alternative, the Court should certify an issue class with regard to one or more of the relevant issues that are stated herein.  Fed. R. Civ. P. 23(c)(4).

## VI.  <u>CLAIMS FOR RELIEF</u>

**COUNT ONE:  VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (UDTPA), N.C.G.S. § 75-1.1, *et seq.*
(Vidant Defendants)**

124.    All above-alleged paragraphs 1 through 123 are incorporated by reference.

125. During the pertinent times, without a valid and enforceable contract with the consumer, Vidant systematically overcharged private insurance patient healthcare consumers, including Mr. Cansler, for CT scans and other services.

126. Vidant Defendants attempted to charge Mr. Cansler a price for a CT scan that was far in excess of the amount that any reasonable consumer ought to pay.

127. The amount for which Vidant Defendants claimed Mr. Cansler was responsible—nearly $3,000 even after all concessions—was an order of magnitude higher than what it should be.

128. As part of Vidant's business model, Mr. Cansler was not told of the unconscionably high price until a bill arrived well after his visit to the hospital.

129. For insured patient consumers, the price for a medical procedure is negotiated between the commercial insurer and Vidant as a percentage of the chargemaster.

130. Consumers of healthcare services are not informed of the chargemaster rates for their procedures prior to receiving treatment. Indeed, during the relevant period, Vidant had a policy of refusing to disclose prices to patients when patients asked.

131. Consumers are not informed of the negotiated rates for their procedures prior to receiving treatment and prior to 2021 could not reasonably ascertain those rates themselves.

132. At all times relevant to this Complaint, Vidant Defendants refused to advise consumers of the cost of their services, and consumers did not and could not discover what Defendants claimed they were owed until well after treatment.

133. At all times relevant to this Complaint, the admission agreement Vidant Defendants required all patients to sign did not contain any price term and was not enforceable.

134. When consumers are unable to pay Vidant Defendants' exorbitant rates, Vidant Defendants send bill after bill, demanding payment on such short timelines that bills can arrive after the payment due date.

135. When consumers are unable to pay the bill or when they dispute the bill, Vidant Defendants send patients to collections.

136. Vidant Defendants and Defendant FirstPoint repeatedly threaten consumers' credit scores.

137. Vidant Defendants' conduct during the pertinent times has been unfair and deceptive within the meaning of the UDTPA.

138. Vidant Defendants' relevant unfair and deceptive conduct during the pertinent times affected commerce within the meaning of the UDTPA.

139. Vidant Defendants' relevant unfair and deceptive conduct during the pertinent times was a substantial factor in causing injury to the Plaintiff and was a cause of the harm to Plaintiff and class members.

140. Plaintiff relied to his detriment on Vidant Defendants' misrepresentations and actionable omission, and but for Vidant Defendants' unfair and deceptive conduct, Plaintiff would not have been deemed to owe approximately $3,000.

141. As a direct and proximate result of Vidant Defendants' engagement in unfair and deceptive trade practices in and affecting commerce, Plaintiff and the class were damaged.

142. Accordingly, Plaintiff and class members are entitled to an award of actual and treble damages and attorney's fees and costs.

## COUNT TWO: DECLARATORY AND INJUNCTIVE RELIEF
### (Vidant Defendants)

143. All above-alleged paragraphs 1 through 142 are incorporated by reference.

144.    Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a).

145.    Under 28 U.S.C. § 2202, "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

146.    Mr. Cansler and class members signed an "Authorization & Consent for Treatment and Assignment of Benefits" or similar consent to treatment forms. These forms did not contain any price term or reference to a price that the patients could read and understand.

147.    Because Mr. Cansler and class members never agreed to pay Defendants' inflated prices, Defendants are entitled only to a reasonable price for the services they provided.

148.    Mr. Cansler and class members are entitled to a declaratory judgment that they owe Defendants no more than the reasonable price for the medical services they received.

149.    As described herein, an actual controversy has arisen and now exists as to whether Defendants implemented and maintained reasonable billing and hospital bill debt collection procedures and practices.

150.    A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent a continuation of improper billing and collection conduct and practices by Vidant Defendants.

151.    Vidant Defendants were entitled to no more than the reasonable price for medical services.

152.    The most recently Mr. Cansler and his family were subjected to collection efforts was on May 26, 2021.  They have a reasonable concern that they will be subjected to further collection efforts into the future.  They have standing to seek a declaratory judgment.

153.    Plaintiff and class members are entitled to a declaratory judgment that Vidant Defendants are only allowed to undertake to collect the reasonable value of their service.

**COUNT THREE:  FAIR DEBT COLLECTION PRACTICES ACT (FDCPA),**
**15 U.S.C. § 1692 *et seq.***
**(Defendant FirstPoint)**

154.    All above-alleged paragraphs 1 through 153 are incorporated by reference.

155.    FirstPoint is a "debt collector" as defined by the FDCPA. 15 U.S.C. § 1692a(6).

156.    Plaintiff is a "consumer" within the meaning of 15 U.S.C. § 1692a(3).

157.    During the pertinent times, Defendant FirstPoint violated the FDCPA by telephoning Plaintiff's spouse after Defendant received a communication from Plaintiff instructing Defendant not to telephone further.  *See* 15 U.S.C. § 1692c(c) & (d); 12 C.F.R. § 1006.6(a)(1); 12 C.F.R. § 1006.14(h)(1).

158.    Defendant FirstPoint violated the FDCPA by telephoning Plaintiff at his place of work after Defendant received a communication from Plaintiff instructing Defendant not to telephone further.  *See* 15 U.S.C. § 1692c(c); 12 C.F.R. § 1006.6(b)(3); 12 C.F.R. § 1006.14(h)(1).

159.    The FDCPA prohibits a debt collector from misrepresenting the character, amount, or legal status of any debt. 15 U.S.C. § 1692e(2)(A); 12 C.F.R. § 1006.18(b)(2)(i).  During the pertinent times, Defendant FirstPoint violated the FDCPA by seeking to collect on an unlawful and void debt.  The FDCPA bars the collection of any amount unless the amount is expressly authorized by the agreement creating the debt or permitted by law.  15 U.S.C. § 1692f(1).  Here, there was no legally valid agreement to create the debt.

160.    Due to Defendant FirstPoint's violations of the FDCPA, under 15 U.S.C. § 1692k

Plaintiff is entitled to recover (1) any actual damage sustained by Plaintiff as a result of such

violations; (2) such additional damages as the court may allow, but not exceeding $1,000; (3) such

amount as the Court may allow for all other class members, without regard to a minimum

individual recovery, not to exceed the lesser of $500,000 or one per centum of the net worth of the

debt collector; and (4) the costs of the action, together with a reasonable attorney's fee as

determined by the Court.

## COUNT FOUR:  NORTH CAROLINA COLLECTION AGENCY ACT (NCCAA), N.C.G.S. § 58-70-1, *et seq.* (Defendant FirstPoint)

161.    All above-alleged paragraphs 1 through 160 are incorporated by reference.

162.    FirstPoint is a "collection agency" as defined by the NCCAA, N.C.G.S. §§ 58-70-

15 and 58-70-90(1).

163.    Plaintiff is a "consumer" pursuant to N.C.G.S. § 58-70-90(2).

164.    The subject medical bill and purported obligation was a "debt" pursuant to

N.C.G.S. § 58-70-90(3).

165.    During the pertinent times, Defendant FirstPoint violated the NCCAA by

telephoning Plaintiff at his place of work after Defendant received a communication from Plaintiff

instructing Defendant FirstPoint not to contact him further.   N.C.G.S. § 58-70-100(4).

166.    During the pertinent times, Defendant FirstPoint violated the NCCAA by seeking

to collect on an unlawful and void debt.  N.C.G.S. § 58-70-95(8).

167.    Under N.C.G.S. § 58-70-130, as a result of its violation of the NCCAA Defendant

FirstPoint is liable for any actual damages sustained by the debtor as a result of the violation and

27

a penalty in such amount as the court may allow between $500 and $4000 per violation and attorney's fees and costs.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment on his behalf as follows:

A.    That Plaintiff and class members are entitled to a determination of liability on each of the claims stated herein;

B.    That under the circumstances any debt purportedly owed by Plaintiff to any of Defendants should be deemed void and unenforceable;

C.    That a class may properly be certified under Rule 23 with the Plaintiff as the class representative and the undersigned counsel as class counsel;

D.    That judgment be entered against Defendants in favor of the Plaintiff and class members;

E.    That the Court enter appropriate declaratory and injunctive relief as to Plaintiff and class members;

F.    That the Court award Plaintiff and class members compensatory, actual, statutory and treble damages in an amount to be determined at trial;

G.    That the Court award Plaintiff and class members his and their costs and expenses of suit, and reasonable attorneys' fees as provided by law; and

H.    For such other and further relief as the Court may deem just and proper.

28

This the 18th day of February, 2022.

WALLACE & GRAHAM, PA

/s/ John Hughes
Mona Lisa Wallace
N.C. State Bar #9021
John Hughes
N.C. State Bar # 22126
525 N. Main Street
Salisbury, NC 28144
Phone: (704) 633-5244
Mwallace@wallacegraham.com
Jhughes@wallacegraham.com

FAIRMARK PARTNERS LLP

Jamie Crooks (*PHV forthcoming*)
1499 Massachusetts Avenue, NW
Washington, D.C. 20005
Phone: 619-507-4182
jamie@fairmarklaw.com

Professor Barak D. Richman (*PHV forthcoming*)
Phone: (919) 613-7244
E-mail: richman@law.duke.edu

*Counsel for Plaintiffs*